UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| ARIEL GOMEZ, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 14-2172 |
| | ) |
| DANIEL REARDON, | ) |
| et al., | ) |
| Defendants. | ) |

ORDER DENYING PETITION
FOR INJUNCTIVE RELIEF

This is a case brought under the provisions of 42 U.S.C.§ 1983. The court has jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction).

The plaintiff, Ariel Gomez, is a prisoner committed to the Illinois Department of Corrections (IDOC) and is assigned to the Danville Correctional Center (DCC).[1] Gomez claims violations of his Eighth Amendment right to be free from deliberate indifference to his serious medical conditions.

Gomez names as defendants Daniel Reardon, the Warden of DCC; Salvador Godinez, the Director of IDOC; Dr. Paul Talbot, the Medical Director at DCC; and Wexford Health Sources, Inc. (Wexford). The IDOC outsources medical care to Wexford. Specifically, Gomez claims that the defendants are deliberately indifferent to his serious medical conditions of leg swelling and pain which the plaintiff attributes to blood clots and a possible deep vein thrombosis (DVT). He also claims migraine headaches, dizziness, blurred vision, vomiting, and nodules or lumps on the back of his head that he believes may indicate a serious neurologic malady. Gomez claims that his medical problems began in mid-May 2014.

On July 23, 2014, the court held a full hearing on the plaintiff's motion for a temporary restraining order and preliminary injunction. He seeks an order for the defendants to send him to a hospital for adequate and appropriate medical tests, and appropriate follow-up care based on the test results. The plaintiff appeared personally,[2] accompanied by one of his counsel, David Benjamin Owens, Esq. Defendant Dr. Talbot appeared by video conference, accompanied by his

---

[1] Gomez is apparently a model prisoner. In 17 years of incarceration, he hasn't had a single disciplinary ticket. He will, if good time is considered, be eligible for consideration for parole in three years. At the time of the hearing, he was housed in the DCC infirmary.

[2] For what it is worth, the court observed the plaintiff to be a young man in his middle thirties. He moved easily and with alacrity between his seat at counsel table and the chair in the witness box. He was alert and oriented as to person, time and place. He answered all questions responsively and directly.

counsel, Joseph N. Rupcich, Esq., who also represented defendant Wexford. Each of the remaining defendants appeared through Assistant Illinois Attorney General, Lisa Cook, Esq.

The plaintiff testified fully about his subjective symptoms, physical condition, and suspected maladies.[3] Dr. Talbot[4] testified at great length, referring to plaintiff's Exhibit 1, about the plaintiff's treatment and the medical care he received at DCC. Plaintiff's Exhibit 1 was received in evidence by agreement. The exhibit is a copy of the plaintiff's recent medical records at DCC. The plaintiff also offered in evidence copies of three medical journal articles that had been tendered to counsel for Dr. Talbot prior to the hearing. The articles were not received in evidence for lack of foundation.

The dispositive issue before the court, the *sine qua non*, is whether, at this point, the plaintiff has made at least a *prima facie* showing that Talbot was "deliberately indifferent" to the plaintiff's serious medical needs. At this point, he has not.

The plaintiff's testimony taken at face value and granting that it showed a serious medical need, the controlling question remains: Was Talbot deliberately indifferent to that need? To constitute a constitutional violation there must be deliberate indifference. *King v. Kramer,* 680 F.3d 1013, 1018-19 (7th Cir. 2012) tells us the answer. To constitute a constitutional violation, the treatment must be **"so far out of bounds that it was blatantly inappropriate or not even based on medical judgment."** (Emphasis added). *See also Hayes v. Snyder*, 546 F.3d 516 (7th Cir. 2008) (excruciating pain from growing testicular cysts lasting several years prior to inmate's parole); *Greeno v. Daley*, 414 F.3d 645 (7th Cir. 2005) ("[for] a year-and-a-half the defendants persisted in a course of treatment known to be ineffective"); *Hartsfield v. Colburn*, 371 F.3d 454 (8th Cir. 2004) (dental treatment withheld because of detainee's behavioral problems, despite bleeding and swollen gums and signs of infection).

Dr. Talbot testified explicitly about the procedures and treatment rendered each time Gomez presented himself at the DCC medical care unit.[4][5] Dr. Talbot examined Gomez and observed no neurological deficits or problems. His eyes responded appropriately to light. Motor skills and sensory responses were normal. Dr. Talbot ordered, and later reviewed, the results of an optometry exam, which did not reflect any problems such as iritis or retinal problems. The optometry exam simply indicated that Gomez needed reading glasses. When Gomez presented and complained of dizziness he was given Meclizine, a medicine to treat vertigo. When he presented and complained of lower leg pain ("trace edema," according to Dr. Talbot), he was

---

[3] *See* Transcript, d/e 17, pp. 4-38.

[4] Dr. Talbot, in addition to his M.D., holds a Ph.D. in pharmacology.

[4] *See* Transcript, d/e 17, pp. 38-99.

[5] Gomez, at the time of the hearing, had been housed in the DCC infirmary for eight days for observation to identify a pattern causing the headaches and to see how the medications were working. Before the court hearing, Gomez told Dr. Talbot he was ready to leave the infirmary.

2

given ibuprofen.[6] When he presented and complained of severe headaches, he was given Excedrin Migraine pain reliever, and later was prescribed Imitrex (a migraine medication), and for his neck muscle strain he was presecribed a muscle relaxer, Robaxin (methocarbamol). Gomez reported that the medications were effective, at least temporarily.

Dr. Talbot testified to the medical basis for his prescribed treatment. Perhaps one could argue, or some other physician might testify, that the medical judgment was flawed, but that in and of itself would not support a finding of deliberate indifference in the constitutional sense. The same is true of the plaintiff's complaints of pain and swelling in his lower leg that he feared indicated blood clots that would go to his lungs or heart and kill him. Dr. Talbot gave medical reasons why the plaintiff's fears were ill founded and the treatment given was appropriate to the condition presented. As to the nodules on the back of Gomez's head, Dr. Talbot measured and examined them and was of the opinion that they were not indicative of some serious underlying condition. Again, some other physician might disagree and have prescribed a series of other tests. Again, that is not the inquiry at this point in the litigation. Dr. Talbot based his diagnosis and treatment on medical reasons. He was not being deliberately indifferent to the plaintiff's medical claims.

Based on the preliminary record presented to the court, the court disagrees that the plaintiff has been shown deliberate indifference to his medical needs in a constitutional context. The court has not addressed the additional factors of irreparable injury or likelihood of success that are usually considered on applications for preliminary injunctive relief. There is no occasion to discuss them since the cardinal question of deliberate indifference is dispositive.

It is therefore ordered that the plaintiff's motion for a temporary restraining order and preliminary injunction [2] is denied. The defendants shall file their <u>answers</u> within twenty-one days of the date of this order. A case management order will be entered shortly after the answers are filed.

Enter this 1st day of August, 2014.

**/s/Harold A. Baker**
_____
Harold A. Baker
United States District Judge

---

[6] Dr. Talbot believed the swelling to be related to arthritis from an injury Gomez suffered in 1997. A 2010 xray showed a deformity in the left distal tibia. After eight days in the infirmary prior to the hearing, Gomez had no pain, tenderness, or swelling in his leg. Dr. Talbot explained that if there were blood clots near Gomez's ankle, the clots would be unlikely to move to his upper body. Dr. Talbot also spoke to the danger of treating inmates with unnecessary blood thinners: "he can go back and get in a fight and hemorrhage; and without a DVT, that would be a big problem." Transcript, d/e 17, p. 97.